## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

ROBERT and ANNA TRIPODI,       Civ. No. 12-1828 (NLH/KMW)
husband and wife,

           Plaintiffs,       **OPINION**

    v.

UNIVERSAL NORTH AMERICA
INSURANCE COMPANY,

           Defendant.

---

**APPEARANCES:**

Thomas T. Booth, Jr., Esquire
Law Offices of Thomas T. Booth, Jr., LLC
129 W. Evesham Road
Voorhees, New Jersey 08043

     *Attorney for Plaintiffs Robert and Anna Tripodi*

Andrew G. Siegeltuch, Esquire
Sweeney & Sheehan, PC
Sentry Office Plaza
216 Haddon Avenue
Suite 500
Westmont, New Jersey 08108

     *Attorneys for Universal North America Insurance Company*

**HILLMAN, District Judge**

This matter comes before the Court by way of cross motions [Doc. Nos. 14, 15] for summary judgment pursuant to Federal Rule of Civil Procedure 56 brought by Defendant Universal North America Insurance Company ("Universal" or "Defendant") and by Plaintiffs Robert and Anna Tripodi.  The Court has considered the

parties' submissions and decides this matter pursuant to Federal
Rule of Civil Procedure 78.

For the reasons expressed below, Plaintiffs' motion for
summary judgment will be granted in part and denied in part.
Defendant's motion will be denied in its entirety.

## I.   JURISDICTION

In this action, Plaintiffs assert claims for breach of
contract and bad faith with respect to an insurance policy issued
by Universal.  The Court exercises diversity jurisdiction over
Plaintiffs' state law claims pursuant to 28 U.S.C. § 1332.
Complete diversity of citizenship exists between Plaintiffs, a
husband and wife who are citizens of the state of New Jersey, and
Defendant, which is a citizen of the state of Texas where it is
incorporated and maintains its principal place of business.  The
amount in controversy here exceeds $75,000 exclusive of interest
and costs.

## II.  BACKGROUND

Plaintiffs seek to recover insurance proceeds and damages
for bad faith with respect to a homeowners' insurance policy
(the "Policy") Universal issued to Plaintiffs for coverage of
Plaintiffs' residence located at 739 Wills Avenue in Woodbury,
New Jersey.  (Def.'s Mot. for Summ. J. [Doc. No. 14]

(hereinafter, "Def.'s SOF"),[1] ¶ 1; Pls.' Reply to Def.'s Proposed Statement of Undisputed Material Facts [Doc. No. 17] (hereinafter, "Pls.' Reply SOF"), ¶ 1.)  Plaintiffs' claimed loss under the Policy arises out of a home improvement project Plaintiffs initiated in December of 2011.  Plaintiffs decided to install a water proofing system in the basement of their home. (Pl.'s Statement of Undisputed Material Facts [Doc. No. 15-1] (hereinafter, "Pls.' SOF"), ¶ 2; Def.'s Resp. to Pls.' Statement of Undisputed Material Facts [Doc. No. 16] (hereinafter, "Def.'s Resp. SOF"), ¶ 2.)

On approximately December 5, 2011, Plaintiffs began construction of a drainage system in the basement which consisted of a perimeter drain trench and sump pump.  (Def.'s SOF ¶¶ 2-3; Pls.' Reply SOF ¶ 2-3.)  As part of the construction process, from December 5, 2011 through December 7, 2011, Plaintiffs utilized a jackhammer in order to break up the concrete slab flooring of the basement around the perimeter

---

[1]     Although not specifically designated as such, the Court construes the first eight pages of Defendant's Motion for Summary Judgment to constitute Universal's Statement of Material Facts Not in Dispute pursuant to Local Civil Rule 56.1(a).  The Court will refer to this portion of Universal's motion as its Statement of Facts ("Def.'s SOF") for ease of reference in this Opinion.

where the floor met the foundation walls.  (Def.'s SOF ¶ 4;
Pls.' Reply SOF ¶ 4.)  After the concrete slab floor was broken
up and removed, Plaintiffs dug down into the foundation
approximately twelve inches (12") in order to install a bed of
stones and the accompanying drainage system.  (Id.)

In the early morning hours of December 8, 2011, Plaintiffs
awoke to the sound of a loud noise coming from the basement.
(Def.'s SOF ¶ 7; Pls.' Reply SOF ¶ 7.)  Upon entering the
basement to investigate, Plaintiffs observed that the basement
wall on the right side of the home had been damaged.  (Id.)
Plaintiffs discovered that the wall was approximately two feet
closer than it normally was, there was broken sheetrock, and
they were able to see the outside of the house through the
inside of the house.  (Def.'s SOF ¶ 8; Pls.' Reply SOF ¶ 8.)
Plaintiffs then called 911 and an emergency team from Deptford
Township arrived and immediately placed shoring in the basement
to prevent further damage.  (Def.'s SOF ¶ 10; Pls.' Reply SOF ¶
10; Pls.' SOF ¶ 8; Def.'s Resp. SOF ¶ 8.)  On December 8, 2011,
the property was subsequently declared uninhabitable by Deptford
Township officals.  (Def.'s SOF ¶ 23; Pls.' Reply SOF ¶ 23.)
Plaintiffs then reported this claimed loss to Universal, which
conducted an investigation into the loss, and ultimately denied

coverage under the Policy by letter dated January 5, 2012. (Def.'s SOF ¶ 25; Pls.' Reply SOF ¶ 25.)

As a result of Universal's denial of coverage, Plaintiffs filed suit against Universal in the Superior Court of New Jersey, Law Division, Gloucester County on or about February 24, 2012. (Ex. A to Am. Notice of Removal [Doc. No. 6] 1, 3.) On March 26, 2012, Universal removed the action to this Court pursuant to 28 U.S.C. §§ 1441(a), 1446.[2]

The complaint asserts two counts against Universal. Count One is a breach of contract claim which alleges that the losses suffered by Plaintiffs are insured against under the Policy issued by Universal, that Universal breached the parties' insurance contract by failing to honor and pay Plaintiffs' claims, and that Plaintiffs suffered damages as a result of this breach. (Compl. [Doc. No. 6] ¶¶ 19-22.) Count Two of the complaint is entitled "Bad Faith." Plaintiffs allege that Universal denied coverage when it was clear that the cause of

---

[2] Because Universal's Notice of Removal was insufficient to establish diversity jurisdiction in this case, the Court ordered Universal to show cause within ten days why the case should not be dismissed for lack of subject matter jurisdiction. (Order to Show Cause [Doc. No. 3] 1-2, March 30, 2012.) In accordance with the March 30, 2012 Order to Show Cause, Universal filed an amended notice of removal which properly alleged the citizenship of all parties. (Am. Notice of Removal [Doc. No. 6] ¶¶ 5, 7.)

the loss and loss itself were covered under the Policy.  (<u>Id.</u> ¶¶ 24-25.)  Plaintiffs further assert that there was no debatable reason why the loss should not have been covered under the Policy, and that Universal's denial was arbitrary, capricious and in direct contravention of its own engineering report's stated cause of loss.  (<u>Id.</u> ¶¶ 26-27.)  Plaintiffs also allege that Universal's conduct is outrageous and violates several provisions of the New Jersey Unfair Claims Settlement Practice Act and its accompanying regulations.  (<u>Id.</u> ¶¶ 28-29.)

## III. <u>DISCUSSION</u>

Both parties now move for summary judgment in their favor on all of Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 56.  Summary judgment is appropriate where the Court is satisfied that "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248

6

(1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'"  Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (citing Anderson, 477 U.S. at 255).

Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323 ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." (citation omitted); see also Singletary v. Pa. Dept. of Corr., 266 F.3d 186, 192 n.2 (3d Cir. 2001) ("Although the initial burden is on the summary judgment movant to show the absence of a genuine issue of material fact, 'the burden on the moving party may be discharged by "showing" –– that is, pointing out to the district court –– that there is an absence of evidence to support the

nonmoving party's case' when the nonmoving party bears the ultimate burden of proof.") (citing <u>Celotex</u>, 477 U.S. at 325).

Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. <u>Celotex</u>, 477 U.S. at 324. A "party opposing summary judgment may not rest upon the mere allegations or denials of the ... pleading[s.]" <u>Saldana v. Kmart Corp.</u>, 260 F.3d 228, 232 (3d Cir. 2001) (internal quotations omitted). For "the non-moving party[] to prevail, [that party] must 'make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial.'" <u>Cooper v. Sniezek</u>, 418 F. App'x 56, 58 (3d Cir. 2011) (citing <u>Celotex</u>, 477 U.S. at 322). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. <u>Anderson</u>, 477 U.S. at 256-57.

**IV.** <u>**ANALYSIS**</u>

    **A.** **Breach of Contract Claim**

Under New Jersey law,[3] "[i]nsurance coverage is a matter of

---

[3]    The parties agree that New Jersey law applies to the claims asserted in this diversity case.

contract law determined by the language of insurance agreements."
Ayala v. Assured Lending Corp., 804 F. Supp. 2d 273, 281 (D.N.J.
2011) (citing Longobardi v. Chubb Ins. Co. of N.J., 121 N.J. 530,
582 A.2d 1257, 1260 (1990)).  When the policy's language is clear
and unambiguous, the court is bound to enforce it according to its
plain and ordinary meaning.  Stafford v. Scottsdale Ins. Co., 416
F. App'x 191, 194 (3d Cir. 2010) (citing Voorhees v. Preferred
Mut. Ins. Co., 607 A.2d 1255, 1260 (N.J. 1992)).  However, if
there is any ambiguity with regard to any wording in the policy,
the language should be "construed liberally in the insured's
favor."  Ayala, 804 F. Supp. 2d at 281 (citing Longobardi, 582
A.2d at 1260); see also Zurich Am. Ins. Co. v. Keating Bldg.
Corp., 513 F. Supp. 2d 55, 64 (D.N.J. 2007).

     "A provision of an insurance policy is ambiguous if
reasonably intelligent [persons] on considering it in the context
of the entire policy would honestly differ as to its meaning."
Vlastos v. Sumitoma Marine Fire Ins. Co., 707 F.2d 775, 778 (3d
Cir. 1983).  Moreover, when analyzing an insurance policy, the
court must view it from the perspective of an average
policyholder.  Zurich, 513 F. Supp. 2d at 69; Cont'l Cas. Co. v.
Gamble, No. 05-5189, 2007 WL 1657107, at *4 (D.N.J. June 5, 2007)
(citing Morrison v. Am. Int'l Ins. Co. of Am., 887 A.2d 166, 169

(N.J. Super. Ct. App. Div. 2005) (internal citations omitted)).

The issue the Court must resolve with respect to Plaintiffs' breach of contract claim is whether the damage sustained to the basement wall on the right side of Plaintiffs' home constitutes a "collapse" such that Plaintiffs' are entitled to coverage for this damage under the Policy.[4]  In circumstances where "[t]he term

---

[4]    It appears to the Court that Universal has abandoned any argument regarding whether the cause of the damage was one excluded from coverage under the Policy, and instead relies solely on the argument that the damage sustained to Plaintiffs' home in itself did not qualify as a "collapse" and thus there was no covered loss.  (Def.'s Br. in Response to Pls.' Mem. of Law in Supp. of Their Mot. for Summ. J. [Doc. No. 16] (hereinafter, "Def.'s Opp'n Br."), 2) (acknowledging that the "issue of the role of water as it is referred to in Universal's denial letter [i.e., the water exclusion] is a 'red herring.'  The issue before the Court [on this summary judgment motion] is not whether there was damage, from whatever cause, but whether the damage qualified as a 'collapse' as that term is defined in the [P]olicy.")  Therefore, if the Court finds that the damage sustained qualifies as a "collapse," then Plaintiffs are entitled to coverage under the Policy and summary judgment must be entered in their favor on the breach of contract claim.
In its reply, Universal contends that "[i]f the Court denies [Universal's] current motion, then all matters of disputed fact, including the exclusionary provision [of the Policy], will proceed to trial, nothing more.  There has been no waiver with regard to other provisions of the policy simply because they were not raised in this summary judgment motion, and Universal has not abandoned any defenses available to it in this matter."  (Def.'s Letter Reply 3.)  However, Plaintiffs here have separately moved for summary judgment and their motion clearly raises the applicability of any exclusionary provisions in the Policy.  (See Pls.' Mem. in Supp. 4-6, 8-9, 11-13.)

10

'collapse' is not defined in the policy itself, ... the issue is whether the conditions described constitute 'collapse' as a matter of law." <u>Fantis Foods, Inc. v. North River Ins. Co.</u>, 753 A.2d 176, 182-83 (N.J. Super. Ct. App. Div. 2000). As the New Jersey Superior Court Appellate Division has explained, in defining "collapse" as a matter of law, "New Jersey adheres to the majority view ... [meaning that] [u]nder our law, the collapse peril insured against does not require that structures fall; rather, without any narrowing internal definition, such a policy must be taken to cover any serious impairment of structural integrity that connotes imminent collapse threatening the preservation of the building as a structure or the health and safety of occupants and

---

In responding to Plaintiffs' motion, Universal fails to address the applicability of any exclusionary provisions of the Policy. As a result of Universal's failure to specifically respond on this issue, and the Court finds that Universal has waived its right to assert the applicability of these exclusionary provisions in this litigation. <u>See</u> <u>Daughtry v. Family Dollar Stores, Inc.</u>, No. 09-5111, 2011 WL 601270, at *8 (D.N.J. Aug. 5, 2011) (granting summary judgment for movant on NJLAD claim because nonmovant failed to respond to movant's argument and thus waived claim) (citing <u>Player v. Motiva Enters. LLC</u>, 240 F. App'x 513, 522 n.4 (3d Cir. 2007); <u>cf.</u> <u>Skirpan v. Pinnacle Health Hosps.</u>, No. 07-1730, 2010 WL 3632536, at *6 (M.D. Pa. Apr. 21, 2010) (concluding that where an issue is challenged through a motion for summary judgment "it is incumbent upon the [nonmovant] to affirmatively respond to the merits of a summary judgment motion" and noting that a "failure to respond to arguments raised on summary judgment ... essentially acts as a waiver of these issues.").

passers-by." Id. at 183 (citing Ercolani v. Excelsior Ins. Co.,
830 F.2d 31, 34-35 (3d Cir. 1987)). However, "[w]here the policy
expressly defines 'collapse' there is no ambiguous term for the
court to construe and it should merely apply the policy's
definition of the term." Holiday Village East Home Owners Ass'n,
Inc. v. QBE Ins. Corp., 830 F. Supp. 2d 24, 27 n.4 (D.N.J. 2011),
aff'd, 517 F. App'x 113 (3d Cir. 2013) (citing Duddy v. Gov't Emp.
Ins. Co., 421 N.J. Super. 214, 218, 23 A.3d 436 (App. Div.
2011)).[5]

Universal correctly points out that the Policy at issue here
expressly defines "collapse." (Def.'s Br. 4.) Paragraph 8 of the
Additional Coverages section of the Policy[6] defines "collapse" and

---

[5]   The court in Holiday Village also cited the New Jersey
Superior Court Appellate Division's opinion in Fantis Foods for
the proposition that "under New Jersey law, a collapse provision
'without any narrowing internal definition' should be construed to
include serious impairment and imminent collapse[.]"  830 F. Supp.
2d at 27 n.4 (citing Fantis Foods, 753 A.2d at 1830).

[6]   Plaintiffs, as the insureds, bear the burden of proving that
the damage sustained to their basement is covered under the Policy
as a "collapse."  See Wurst v. State Farm Fire and Cas. Co., 431
F. Supp. 2d 501, 504 (D.N.J. 2006) (noting that "[t]o prevail on
his claim [for breach of contract for the denial of coverage],
[the insured] has the burden of establishing that the collapse of
his basement wall is covered under his homeowners' policy.")
(citing Hartford Accident & Indem. Co. v. Aetna Life & Casualty
Ins. Co., 98 N.J. 18, 26, 483 A.2d 402 (1984) for the proposition
that "insurer bears the burden of proving that an incident falls

provides in pertinent part:

> 8. Collapse
> a.  With respect to this Additional Coverage:
>   (1)  Collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose.
>   (2)  A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse.
>   (3)  A part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building.
>   (4)  A building or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage, or expansion.

(The Policy, Ex. A to Def.'s Mot. for Summ. J. [Doc. No. 14-2] 26-27.)

Plaintiffs argue that the damage to their basement wall satisfies the definition of "collapse" as set forth above because "the foundation wall ... actually moved in and caved in, ... was no longer standing and was incapable of supporting the structure." (Pls.' Mem. of Law in Supp. of Their Mot. for Summ. J. [Doc. No. 15-13] (hereinafter, "Pls.' Supp. Mem."), 3.)  Plaintiffs also argue that they were not permitted to occupy their home as a

_____

within an exclusionary provision of a policy; insured bears the burden of proving coverage under a policy).

residential structure as a result of the damage to the wall in question. (Pls.' Supp. Mem. 3-4.) In further support of their argument, Plaintiffs point out that the definition of "collapse" "does not require a complete and utter falling down of the entire structure and specifically includes the abrupt caving in of a part of a building as a 'collapse.'" (Id. at 4.)

In applying the Policy's definition of the term "collapse," the Court notes at the outset that the parties agree that this case does not involve the collapse of Plaintiff's entire home. (Def.'s SOF ¶ 39; Pls.' Reply SOF ¶ 39.) Universal similarly concedes that the Policy does not require that the entire structure come down. (Def.'s Reply Letter 2.) Thus, it is clear for purposes of this motion that the Court is examining whether the damage sustained to the basement wall constitutes an abrupt falling down or caving in of "any part of a building" rather than the entire building. The Court further notes that the parties are in agreement that the basement wall in question "never collapsed *completely* in." (Def.'s SOF ¶ 15; Pls.' Reply SOF ¶ 15)[7] (emphasis added). Additionally, the parties agree that the

---

[7]    Plaintiffs admit that "the collapse here was not a complete collapse of the basement wall into rubbles." (Pls.' Reply SOF ¶ 15.)

basement ceiling did not collapse as a result of the December 2011 incident, but rather that the ceiling was removed by the emergency personnel who installed the shoring.  (Def.'s SOF ¶ 10; Pls.' Reply SOF ¶ 10.)

Because the Policy at issue defines the term "collapse" and the parties agree that the Policy is not ambiguous, the Court must give the terms of the Policy their plain and ordinary meaning and apply the Policy's definition here.  In doing so, the Court finds that the deposition testimony, the photographic evidence, and the expert reports submitted in support of the parties' motions demonstrate that the damage sustained to Plaintiffs' home satisfies the definition of a "collapse" under the Policy.

The Policy defines collapse, in part, as "an abrupt falling down or caving in of a building or any part of a building[.]" Undisputed testimony by both Plaintiffs indicates that they were awakened in the early morning hours of December 8, 2011 by a loud noise, the cause of which was later determined to be the movement and shifting of the basement wall in question.  The Court is thus satisfied, and Universal does not challenge, that the damage to the basement wall qualifies as "abrupt" given that it happened suddenly and unexpectedly in the middle of the night, without any warning, as opposed to happening gradually over a period of

several weeks or months.  See 773, L.L.C. v. Scottsdale Ins. Co.,
No. 11-2103-KHV, 2012 WL 672366, at *7 (D. Kan. Feb. 29, 2012)
(observing that "the term [abrupt] is ordinarily understood to
mean 'sudden' and 'unexpected.'") (citing Malbco Holdings, LLC v.
AMCO Ins. Co., 629 F. Supp. 2d 1185, 1195 (D. Or. 2009) and
several online dictionaries).

     Moreover, within just days of Plaintiffs reporting the
claimed loss to Universal, Peter Vallas Associates, Inc., at
Universal's request, conducted an on-site examination and a
detailed review of engineering documentation in order to assess
the condition of Plaintiffs' home.  In a report dated December 11,
2011 ("the Vallas Report"), Universal's experts described the
damage as follows.  Initially, they noted that "home was currently
condemned by the local building department because the foundation
wall for the mid span center portion of the building [was]is **no
longer capable of providing adequate support**."  (The Vallas
Report, Ex. E to Def.'s Mot. for Summ. J. [Doc. No. 14-5] 2)
(emphasis added).  The Vallas Report further explained that
"physical observations from the exterior [of the home] would
suggest that the base of the wall had **moved inward** several inches
allowing for the **downward movement** of the wall itself."  (Id.)
(emphasis added).  Upon completing the internal examination of the

basement, Universal's experts confirmed what they observed outside and found "that in fact the wall [in question] **did shift and move inward** at the base." (Id.) (emphasis added). The Vallas Report also noted that the cracks found on both the interior and exterior of the foundation supported the experts' finding of "**shifting and movement** of the base of the wall." (Id.) (emphasis added). According to Universal's experts, "[t]he wall ... **failed** at the exact area where the homeowners were excavating" to install the drainage system. (Id. at 3) (emphasis added).

In October of 2012, Plaintiffs' expert, William H. Green, III, PE,[8] reviewed the photographic evidence of the damage and conducted an on-site examination of the property after repairs had been made. Green explained in his report that masonry walls like the ones in Plaintiffs' basement "are not designed to be freestanding on their own footings" but rather "are designed to hold compression loads and the soil load when completed in the building structure." (Green's Investigation of Basement Wall Collapse Report, Ex. H to Def.'s Mot. for Summ. J. [Doc. No. 14-8]

---

[8]     "PE" is apparently shorthand for an individual designated as a licensed Professional Engineer. (See Green's Review and Comment on the Vallas Report, Ex. I to Pls.' Mot. for Summ. J. [Doc. No. 15-10] 1.)  Universal has not specifically challenged any of Green's findings or opinions set forth in his report.

2.) According to Green, these walls are "require[d] by code to be anchored to the floor framing." (Id.) Green noted that one reason such anchoring is necessary "is to stabilize the wall with a lateral support." (Id.) Green further explained that a basement's concrete floor counterbalances the outside soil forces against the masonry wall and "locks in the bottom course of block and prevents lateral movement and rotation" of the wall. (Id.)

With respect to Plaintiffs' home, Green concluded that "[o]nce the entire concrete floor was removed 14 [inches] from the base of the wall[, the wall] became unstable insofar as its ability to hold the soil load." (Id.) Thus, "[t]he wall caved in due entirely [to] the removal of the basement slab which was an integral part of the stabilizing of the wall." (Id.) Green ultimately determined that "[w]hen the collapse and cave in of the wall occurred it was limited in its movement by a wooden shelf structure on one end[.]" (Id.) The "wall rested against this shelf after it collapsed and caved inward[,] and if it had been otherwise, Green opines, the wall "would have fallen to the floor and may have done further damage to the home." (Id.)

In addition to the findings of these experts, the photos presented to the Court, particularly Exhibits J-1 through J-12 to Plaintiffs' motion, depict what this Court considers to be a wall

–lacking in lateral support - which caved inward to the basement of the home, such that Plaintiffs initially observed that the wall appeared two feet closer than it usually did.  These pictures reflect more than just mere cracking of the foundation, but instead show large chunks of concrete cinderblocks which have fallen off the wall and exposed outside soil that is now visible from inside the basement.

The Court's finding that these pictures show that the basement wall caved in is consistent with the findings of Universal's experts as stated in the Vallas Report.  Specifically, the Vallas Report determined that the foundation wall shifted and moved inward from its base, and as a result, the wall was "no longer capable of providing adequate support" for the home requiring that the "floor joists that normally rest on the foundation wall" be "supported by bracing in order to stabilize the building."  (The Vallas Report, Ex. E to Def.'s Mot. for Summ. J. [Doc. No. 14-5] 2.)  Implicit in these findings is a recognition that the wall itself partially caved in upon itself in a manner that rendered it incapable of providing support for the home.

This evidence makes clear to the Court that although the basement wall in question did not fall down into a complete pile

of rubble, the wall did in fact move and shift inward from its base allowing for further downward movement of the wall itself causing pieces of cinderblock to break and fall down off the wall. The manner in which the wall shifted and moved inward and down from its base comes within the plain meaning of the term "caving in"[9] as used in the Policy. Importantly, Universal does not contest the fact that Green's report found "the presence of cracking and caving inward of the foundation wall from its base."[10] (Def.'s SOF ¶ 29.) Moreover, given that the Policy does not require the complete and total collapse of the entire structure, the Court is satisfied that Plaintiffs' damage constitutes an abrupt caving in of a part of their home sufficient to fall within the Policy definition of "collapse."

Although Universal admits that the Policy "clearly recognizes that a collapse may occur if less than the entire structure comes

---

[9]     Consistent with the Court's interpretation of the Policy here, Merriam Webster's dictionary defines the term "cave-in" as "an occurrence in which something (such as the roof or walls of a building or cave) suddenly falls down or inward." See Merriam-Webster Online Dictionary, available at www.merriam-webster.com (last visited Dec. 27, 2013). "Inward" is further defined as "directed or moving toward the inside of something." Id.

[10]     Universal makes no attempt to challenge the findings in Green's report or to object to the admissibility of his opinions concluding that the basement wall collapsed and caved inward.

down[,]" (see Def.'s Reply Letter Br. [Doc. No. 19] 2), Universal

argues that none of the other conditions required to satisfy the

definition of "collapse" contained in the Policy have been met

here.[11] Universal makes four specific arguments in this regard

which the Court addresses in turn. First, Universal asserts that

a collapse did not occur here because the damage sustained to

Plaintiffs' basement wall did not lead to a situation where the

home or part of the home could not be occupied for its current

intended purpose. (Id.) In support of this argument, Universal

points to deposition testimony by both Plaintiffs admitting that

they "and their children returned to their residence shortly after

the incident and remained there until repairs were completed."

(Id.) (citing Dep. of Robert Tripodi, Ex. C to Def.'s Mot. for

Summ. J. [Doc. No. 14-3] 110; Dep. of Anna Tripodi, Ex. F to

Def.'s Mot. for Summ. J. [Doc. No. 14-6] 7). The Court is not

persuaded by Universal's argument.

Admittedly, Plaintiff Robert Tripodi testified as follows at

---

[11] As Plaintiffs point out, Universal's brief in support of its
own motion for summary judgment offers virtually no argument or
analysis as to how the damage sustained to Plaintiffs' home does
not constitute a collapse within the meaning of the Policy. It is
only in its reply, that Universal articulates its position that
the damage to Plaintiffs' home does not qualify as a "collapse"
under the Policy.

his deposition: "[W]e actually went into our home – back into our home – we weren't supposed to, but we did, prior to Christmas" of 2011 and remained there.  (Dep. of Robert Tripodi, Ex. C to Def.'s Mot. for Summ. J. [Doc. No. 14-3] 110:6-14.)  Plaintiff Anna Tripodi, however, testified in more detail than her husband regarding the specific use of the home during that time period. Anna Tripodi testified that on the "night that the collapse happened, [the] Red Cross put us up into a hotel for four nights. After that our friends rented us a trailer – it's a shore camper that we had on the side of our house so we kind of went from the house to the camper."  (Dep. of Anna Tripodi, Ex. F to Def.'s Mot. for Summ. J. [Doc. No. 14-6] 6:9-14.)  Plaintiff Anna Tripodi further explained that the family "lived in both" the trailer and the house: utilizing the trailer for "cooking and eating" because there was no plumbing on the right side of the house as a result of the damage, but accessing the remainder of the house for purposes of "living and sleeping."  (Id. at 7:3-19.)

Contrary to Universal's assertion that no collapse occurred here because Plaintiffs and their children returned to the home and remained there until after repairs were complete, Anna Tripodi's testimony demonstrates that in fact a collapse did occur within the meaning of the Policy.  The pivotal language of the

Policy is the phrase "with the result that ... part of the building cannot be occupied for its current intended purpose."  As Anna Tripodi explained, the damage to the basement wall resulted in a situation where the kitchen and dining area of Plaintiffs' home could not be used for their intended purposes, i.e. cooking and eating, which forced Plaintiffs and their children to occupy the trailer for those specific purposes.  The fact that Plaintiffs voluntarily reentered their home for the purposes of living and sleeping in areas unaffected by the damage, does not nullify the consequences stemming from the damage to the basement wall. Further, Universal cites no authority in support of its argument that Plaintiffs' return to the home in this limited manner had a transformative effect on the condition of the property rendering it suitable for its current intended purpose.  Despite Universal attempt to argue otherwise, the caving in of the basement wall resulted in circumstances where Plaintiffs were unable to occupy the corresponding portion of their home for its intended use, and that condition of the Policy is satisfied here.

Second, Universal argues that no collapse occurred here because Plaintiff Robert Tripodi testified that the property was only in danger of falling down, rather than having already fallen down, and the Policy expressly states that a building in danger of

falling down or caving in is not in a state of collapse. This argument takes Robert Tripodi's testimony out of context and mischaracterizes it in order to argue that no collapse occurred here. Universal relies on a limited portion of Robert Tripodi's testimony wherein Tripodi was asked "Was the property in danger of falling down?" to which Tripodi responded "Yes." (Dep. of Robert Tripodi, Ex. C to Def.'s Mot. for Summ. J. [Doc. No. 14-3] 117:2-3, 6.) However, just prior to that exchange, portions of the January 31, 2012 letter from Christian McLaughlin, a Deptford Township construction official, were read to Robert Tripodi. Specifically, counsel for Universal stated "The next sentence [of the letter from McLaughlin] reads, 'Due to the actions and fast response of numerous fire departments, the structure was shored up and saved from certain collapse.'" (Id. at 116:22-25.) It was in this particular context that Robert Tripodi answered yes to the question about whether his property was "in danger of falling down." It is thus unclear from Robert Tripodi's testimony whether he was referring to the remainder of the property as being "in danger of falling down" or whether he was referring to the portion of the basement wall that had already sustained damage. Universal cannot rely on this limited testimony from Plaintiff because it is no more conclusive on the issue of whether a collapse occurred

than is Robert Tripodi's earlier testimony in which he repeatedly testified that the wall in question collapsed.

Third, Universal notes that the Policy explicitly states that a part of a building that is standing is not considered to be in a state of collapse, even if it has separated from another part of the building. (Def.'s Reply Letter 2.) Thus, Universal argues that photographs of the damage and testimony by Robert Tripodi demonstrate that a collapse did not occur in this instance because the wall remained standing despite separation of portions of the basement wall from parts of the home. (Id. at 2) (citing Dep. of Robert Tripodi, Ex. C to Def.'s Mot. for Summ. J. [Doc. No. 14-3] 117). The Court rejects this argument. It is clear from the expert reports and the photographs that the basement wall here caved inward and that the only reason any portion of the wall remained upright was because Plaintiffs acted promptly in calling 911 and emergency personnel were able to immediately install shoring to prevent the complete caving in and collapse of the wall into a pile of rubble.

The photographic evidence further demonstrates that the shoring alone is absorbing both the weight of the structure as well as other load pressures that would otherwise be absorbed by the compromised wall. The severity of the damage depicted in the

photographs confirms for the Court that in the absence of the promptly installed shoring, these photographs would in fact be of a large pile of rubble from a completely, as opposed to partially, caved in and collapsed basement wall. Furthermore, any assertion by Universal that no collapse occurred because the wall remained standing and was merely separated from other parts of the home is belied by Defendant's own expert report. The Vallas Report specifically concluded that the basement wall "failed," "the foundation wall ... [was] no longer capable of providing adequate support" for the home, and that "the entire retaining wall of approximately 30 feet [would] need to be removed and of course replaced[.]" (The Vallas Report, Ex. E to Def.'s Mot. for Summ. J. [Doc. No. 14-5] 1-3.) The need for complete removal and replacement of a thirty-foot foundation wall which has failed and can no longer provide support for the structure above is contrary to a commonsense understanding of what constitutes a free standing wall that has merely separated from the home.

Finally, Universal draws the Court's attention to language of the Policy which provides that a building or any part of a building that is standing is still not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

(Def.'s Reply Letter 2.)  Universal argues that the record and
Plaintiffs' own admissions as to the physical condition of the
property demonstrate that the wall is still standing despite
presence of cracking, bulging, sagging, bending, leaning and
settling, and thus no collapse occurred.  (Id.)  This argument
also fails.  Again, to the extent the basement wall remained
upright because the shoring prevented a complete and total cave
in, the damage to the wall as depicted in the photographs and
described by the experts is more than just typical cracking,
bulging, sagging, bending, leaning and settling that often occurs
as a building or structure ages.  The observable, sizable "cracks"
in the wall are so severe that soil from the outside of the home
is visible from inside of the basement.  Moreover, these "cracks"
and "bulging" of the wall are so significant that entire pieces of
the cinderblocks comprising the wall have fallen down.  If not for
the shoring relieving the pressure and load on the basement wall,
there would be no observable cracking, bulging, sagging, bending,
leaning or settling because the only thing visible would be a pile
of crumbled debris.

Relying on these arguments, Universal asserts that Plaintiffs
"have flatly admitted that those conditions which do not
constitute a 'collapse' under the policy existed after the loss"

and have therefore "conceded that there are no issues of material fact with respect to the facts as they apply to the definition of 'collapse' in the [P]olicy." (Def.'s Reply Letter Br. [Doc. No. 19] 2-3.) The Court rejects these arguments for the reasons articulated above, and finds that the damage sustained to Plaintiffs' basement wall constitutes a "collapse" within the meaning of the Policy. On the record presented here, the Court is satisfied that Plaintiffs have met their burden on summary judgment to demonstrate the absence of any genuine issues of material fact and that they are entitled to judgment as a matter of law with respect to the issue of whether they loss was covered under the Policy.[12] In a similar vein, Universal has failed to meet its burden on summary judgment on this issue.

## B. Bad Faith Claim

"The duty of good faith and fair dealing pervades insurance contracts." <u>Sears Mortg. Corp. v. Rose</u>, 134 N.J. 326, 634 A.2d 74, 84 (N.J. 1993); <u>see</u> <u>Price v. N.J. Mfrs. Ins. Co.</u>, 182 N.J. 519, 867 A.2d 1181, 1185 (N.J. 2005) (stating that "every

---

[12] To the extent Plaintiffs seek the entry of summary judgment in their favor with respect to the amount of damages in this case, the Court notes that Universal disputes Plaintiffs' purported damages. Accordingly, the Court's finding that Plaintiffs are entitled to summary judgment on the breach of contract claim will be limited to the issue of liability, not damages.

insurance contract contains an implied covenant of good faith and fair dealing"). In the context of first-party insurance claims, the Supreme Court of New Jersey has held that "[t]o show a claim for bad faith, a plaintiff must show [1] the absence of a reasonable basis for denying benefits of the policy and [2] the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim." Pickett v. Lloyd's, 131 N.J. 457, 621 A.2d 445, 453 (N.J. 1993) (citation and internal quotation marks omitted); see Ketzner v. John Hancock Mut. Life Ins. Co., 118 F. App'x 594, 599 (3d Cir. 2004) ("Under New Jersey law, to establish a claim for bad faith in the insurance context, a plaintiff must show two elements: (1) the insurer lacked a 'fairly debatable' reason for its failure to pay a claim, and (2) the insurer knew or recklessly disregarded the lack of a reasonable basis for denying the claim.").

A plaintiff may also demonstrate an insurer's bad faith when the insurer unreasonably delays the processing of a valid claim, and the insurer knows or recklessly disregards the fact that the delay is unreasonable. See Pickett, 621 A.2d at 473–74; see Enright v. Farm Family Cas. Ins. Co., 2005 U.S. Dist. LEXIS 37544, at *29 (D.N.J. Dec. 29, 2005) ("An insured can also establish bad faith by showing that no valid reasons existed for

a delay in processing the claim and that the insurer either knew
of, or recklessly disregarded, the fact that no valid reasons
supported the delay." (citing Pickett, 621 A.2d at 454)).
However, neither negligence nor mistake may constitute bad faith
on behalf of an insurer.  Rothschild v. Foremost Ins. Co., 653 F.
Supp. 2d 526, 536 (D.N.J. 2009).

"Rather, it must be demonstrated that the insurer's conduct
is unreasonable and the insurer knows that the conduct is
unreasonable, or that it recklessly disregards the fact that the
conduct is unreasonable." Id.  In other words, to show that an
insurer has acted in bad faith, a plaintiff must demonstrate that
no fairly debatable reason exists for denying or delaying the
processing of a claim. Pickett, 621 A.2d at 453-54.  "Under the
'fairly debatable' standard, a claimant must establish a right to
summary judgment on the substantive claim in order to be entitled
to assert a claim against the insurer for bad faith refusal to
pay [or delay in processing]."  McCartney v. Transamerica Ins. &
Inv. Group, 2008 U.S. Dist. LEXIS 61204, at *6 (D.N.J. Aug. 4,
2008).

In support of its argument that Defendant is entitled to
summary judgment on Plaintiffs' claim of bad faith, Universal
point to specific facts or other sufficient evidence in support

of its motion, but argues only that there "is nothing in the record to suggest that Universal lacked a reasonable basis for denying the claim and certainly nothing evidencing a reckless disregard of the facts on its part." (Def.'s Br. 7.) Universal simply contends that Plaintiffs have "failed to make a showing that meets the standard set forth by the New Jersey Supreme Court in Pickett, ... hence summary judgment should be entered in favor of Universal." (<u>Id.</u>)

Plaintiffs have also moved for summary judgment on their bad faith claim. In support of their own motion, Plaintiffs contend Universal engaged in bad faith because it: conducted a grossly inadequate investigation into Plaintiffs' loss, affirmatively misrepresented the findings of the Vallas Report in its letter to Plaintiffs denying coverage, added conditions to coverage that are not otherwise required under the Policy, and affirmatively misrepresented that engineers were present at the site inspection. (Pls.' Supp. Mem. 13-20.) However, Plaintiffs fail to provide the Court with sufficient evidence that Universal acted with reckless indifference to the proofs Plaintiffs submitted in support of coverage.

The Court's review of the record and the documents submitted in support of both parties motions does not present sufficient

evidence for the Court to make a determination at this time on whether Universal acted with knowledge or reckless disregard of the lack of a reasonable basis for denying Plaintiffs' claim, the second prong of the test set forth in <u>Pickett</u>.  Universal's point is well taken that at this point in time, Plaintiffs have not conducted any depositions of any of Defendant's employees or any of the individuals involved in the investigation and evaluation of Plaintiffs' claim by Universal.  Given the underdeveloped record on this issue, a determination on summary judgment with respect to Plaintiffs' bad faith claim is premature at this time.  Accordingly, both parties' motions will be denied with respect to this issue.

**V.**    **CONCLUSION**

For the foregoing reasons, Defendant Universal North America Insurance Company's motion for summary judgment [Doc. No. 14] is denied in its entirety, and Plaintiffs' motion for summary judgment [Doc. No. 15] is granted in part, and denied in part. An Order consistent with this Opinion will be entered.


Dated:  December 31, 2013              s/ Noel L. Hillman
                                     NOEL L. HILLMAN, U.S.D.J.

At Camden, New Jersey